## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Ardak Akishev, et al.,<br><br>    Plaintiffs,<br><br><br>               v.<br><br><br>Sergey Kapustin, et al.,<br><br><br>    Defendants. | Civil Action No.<br>13-7152(NLH)(AMD)<br><br><br>**OPINION** |

**APPEARANCES:**

ANNA V. BROWN
MARIA TEMKIN
BROWN LEGAL CONSULTING LLC
1959 THE WOODS II
CHERRY HILL, NJ 08003
    On behalf of plaintiffs/cross-claim plaintiffs

SERGEY KAPUSTIN
307 RIDGEWAY ST.
PHILADELPHIA, PA 19116
    Defendant appearing *pro se*

JON WERNER
LYONS & FLOOD LLP
ONE EXCHANGE PLAZA
55 BROADWAY, SUITE 1501
NEW YORK, NY 10006
    On behalf of defendants Michael Hitrinov and Empire
    United Lines, Co., Inc.

JEFF H. GOLDSMITH
2050 CENTER AVENUE
SUITE 318
FORT LEE, NJ 07024
    On behalf of intervenor DK International Trading Inc.

**HILLMAN, District Judge**

    Presently before the Court is the motion of intervenor DK

International Trading Inc. for relief from the Court's freeze

order (Docket No. 351), and the motion of defendant Sergey Kapustin to invalidate the default judgment entered against him (Docket No. 368).  For the reasons expressed below, both motions will be denied.[1]

## BACKGROUND

The history of this case, which the Court has described as labyrinthine, has been set forth several times.  (See, e.g., Docket No. 358.)  For context to resolve the two pending motions, the Court restates the following background:

### Procedural history of this case in this Court

Global Auto Enterprise is a group of individuals (four family members and at least one employee) and affiliated

---

[1]A third motion [Docket No. 347] will also be denied.  In his motion, defendant Sergey Kapustin seeks to disqualify Plaintiffs' counsel from pursuing cross-claims he assigned to the plaintiffs in an attempt to satisfy plaintiffs' claims against him.  First, nothing in Kapustin's motion serves to undermine that assignment.  Second, his claim that plaintiffs' counsel have sought to sell two cars that had been previously sold to others is undermined by Kapustin's own statements to this Court that he owned those cars free and clear.  Third, his apparent disagreement with Plaintiffs' counsel about the merits of the cross-claims is suspect as he himself brought those claims in the first instance and has repeatedly asserted to this Court that his failure to deliver certain cars to Europe was the fault of the cross-claim defendants.  That he now suggests otherwise is likely another example of his repeated efforts to change his position to suit the argument or the day.  Here, as set forth in Plaintiffs' response, the attempt to undermine the cross-claims through vague and unsupported allegations and conspiratorial musings appears to be in retaliation for Plaintiffs' efforts to obtain judgment against his close family members.  Whatever the motivation may be, in the end, this disagreement over the merits of the cross-claims is just that, a disagreement, and will resolve itself when the cross-claims are fully litigated.  It does not provide a reason to disqualify counsel.

entities owned by the same family members who ran a fraudulent internet auto sales scheme.  The fraud is commonly known to law enforcement as a "bait and switch" tactic.  Global Auto Enterprise targets online and often unsophisticated foreigners from the former Soviet Union by advertising vehicles slightly below the market value on its glamorous websites GlobalAutoUSA.com and EffectAuto.com.  In order to lure the victims, Global Defendants provided false odometer readings or did not disclose the mileage at all or withheld the information that the vehicle had been declared "total loss" after an accident or flooded by hurricane Sandy with a "Salvage" title issued.  Rather than disclosing the true condition of the car, they assured the victims that the cars were in "excellent" condition.  Most vehicles advertised on the websites did not actually belong to any Defendants. Instead, they used images of cars and information about them gathered from other online car sales sites to advertise these vehicles as "bait."  Once Plaintiffs wired the purchase price, the "switch" part of the fraud began.

Defendants wrote apologetic emails that they were encountering delays in delivery and refused to issue any refunds.  These kinds of "lulling" communications are typical of this type of fraud.  Months later, the buyers were offered a different car for just a few thousand more.  Buyers – by then desperate to get anything at all out of the deal – wired additional money.  Plaintiffs Kondratuk, Borzenko, Maniashin,

3

Lisitsyn, Pukir, Lukyanov, the Yamkoviys were pushed to make several international wire transfers.

After the switch, even Plaintiffs (Kobin, Telin, Borzenko and the Zverevs) who were seemingly getting a different car for the same price also got hit with unloading fees, port fees, transportation fees, storage fees, customs fees, and other fees, in excess of several thousand dollars, that were not previously disclosed to them.  That was also a scheme to push the victims to cancel the purchase and simply retain the proceeds.  Global Auto Enterprise refused to release the cars unless those charges are paid.[2]

On April 4, 2014, Plaintiffs filed an Amended Complaint. On June 3, 2014, Plaintiffs filed their Motion for an Order to Freeze the Assets of Defendants and Expedited Discovery Related to Assets pursuant to Federal Rule of Civil Procedure 65 ("Asset Freeze Motion") representing the funds Plaintiffs wired to the bank accounts of corporate Global Defendants.  On September 5, 2014, the Court held an evidentiary hearing on the Asset Freeze Motion.

On September 23, 2014, to avoid the immediate freeze of the corporate Global Defendants' bank accounts, Plaintiffs and

---

[2] In a related version of the fraud, defendants would explain that unexpected repairs were needed on the car and demanded payment to cover these costs.  As noted below, in yet another permutation of the extensive fraud scheme and whether he owned or had access to the car or not, Kapustin, by his own admission under oath, would often sell the same car to two different victims.

4

Global Defendants agreed to and the Court entered the Consent
Order, Docket No. 80, to deposit into the registry of the
Court $400,000.00 in monthly installments within 90 days of
the Consent Order and to provide expedited discovery related
to the disposition of Plaintiffs' funds and Defendants'
assets.

   This turned out to be another lulling technique with this
time the Court as the victim as Kapustin would later admit he
had no ability to satisfy the terms of the Consent Order at
the time it was approved by the Court and entered at his
request.  On October 7, 2014, in order to evade his
obligations under the Consent Order, Defendant Sergey Kapustin
filed his Chapter 13 Bankruptcy Petition (Case No. 14-30488).

   On October 24, 27, 28, 29 and November 3, 2014, the Court
held evidentiary hearings during which it was established that
while Global Defendants websites www.globalautousa.com,
www.effectauto.com, and www.effectauto.ru ("Websites")
advertised over 4,000 vehicles as "in stock", Defendant
Kapustin testified only about 14 vehicles were actually owned
by the corporate Global Defendants, and some vehicles were
sold twice through the Websites to foreign customers using
electronic mail communications and international bank wire
payments.

   Based on the evidence presented the Court made its
preliminary finding that plaintiffs had shown by a
preponderance of the evidence that the Global Defendants had

committed at least two predicate acts of mail and wire fraud
in the furtherance of a RICO enterprise through a pattern of
racketeering activity conducted operating through the
Internet; on October 27 and October 29, 2014, this Court
ordered that the Defendants' corporate bank accounts to be
frozen and the Websites to be shut down immediately. (Docket
Nos. 106; 110).

On November 4, 2014, corporate Global Defendants filed
their Chapter 7 bankruptcy petitions (Global Auto Sales (Case
No. 14-32520), Effect Auto Sales, Inc. (Case No. 14-32521), G
Auto Sales, Inc. (Case No. 14-32522) and SK Imports,
Inc. (Case No. 14-32523).  The bankruptcies were subsequently
dismissed for bad faith pursuant to Sections 105(a), 305(a),
349 and 707(a) of the Bankruptcy Code.

On February 17, 2015, Plaintiffs moved for sanctions
against Global Defendants and their counsel ("Sanctions'
Motion") including entering a default judgment as a sanction
for their continuing litigation misconduct including numerous
fraudulent representations to the Court, dissipation of assets
in order to avoid compliance with the Consent Order,
concealment of assets in foreign jurisdictions, filing
bankruptcy petitions in bad faith for the purpose of invoking
the automatic stay and frustrating this Court's jurisdiction,
continuing delay resulting in significant prejudice to
Plaintiffs.

On April 27, 2015, the Court held an evidentiary hearing and granted the Plaintiffs' Sanctions Motion.  On May 27, 2015, Plaintiffs submitted their Application to Assess Damages for Default Judgment.  On June 29, 2015, the Court held a hearing on plaintiffs' motion for default judgment, DK Internationals' request to intervene, and other issues related to defendants' assets.  On July 2, 2015, the Court issued a "freeze order" to prevent Kapustin and the Global defendants from dissipating or otherwise touching their assets in order to halt defendants' fraudulent actions.

On September 4, 2015, the Court held an evidentiary hearing and made the finding that Global Defendants were responsible for executing and masterminding the "bait and switch" fraud scheme targeting online and often unsophisticated foreigners from the former Soviet Union and other countries by advertising vehicles for sale below the market value.  Defendant Kapustin, as owner of corporate Global Defendants, exercised complete dominion and control over the corporations and used the corporations as his alter egos for his own purposes, making all the decisions including the decisions to defraud Plaintiffs.

The Court further made its finding that Defendant Sergey Kapustin and the corporate Global Defendants are a group of RICO persons, Global Companies Enterprise, associated in fact for the common purpose of engaging in fraudulent conduct constituting a RICO enterprise defined in 18 U.S.C. § 1961(4)

7

functioning together as a continuing unit, each of them necessary to accomplish each step or aspect of the fraudulent scheme.  Defendant Sergey Kapustin and corporate Global Defendants acted in concert for the shared goal of defrauding overseas car buyers and receiving profits from the fraudulent scheme.  This enterprise affected interstate and foreign commerce because it exported vehicles to foreign countries and both sent and received funds through banks in the United States and abroad.

Defendant Sergey Kapustin, who is a person within the meaning of RICO, managed and participated in conduct of the Global Companies Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), including multiple acts of wire fraud, mail fraud, and financial fraud. The Court found that Global Defendants engaged in the pattern of racketeering activity, which included related violations of 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from unlawful activity); 18 U.S.C. § 1952 (Travel Act), and 18 U.S.C. § 1912 (witness intimidation), as included in 18 U.S.C. 1961(1).

The pattern of the racketeering activity began no later than some time in 2008 resulting in an investigation by Attorney General for the State of New Jersey Division of Consumer Affairs of deceptive conduct of Global Auto

8

Enterprise, resulting on November 19, 2010, in the consent judgment for injunctive relief, civil penalties, legal fees and restitution to victims.  The scheme continued in 2012 when Global Defendants committed predicate acts of racketeering towards Plaintiffs Yamkoviys, and continued through February 2014, when Defendants committed acts of wire fraud (18 U.S.C. § 1343) towards Plaintiff Pukir.  Global Defendants continued the pattern by filing fraudulent bankruptcies.  Global Defendants' acts were arranged and ordered so as to exhibit both a relation between the predicate acts and the threat of continuing unlawful activity.

Defendants' acts of mail fraud, wire fraud, and financial fraud were open-ended and occurring on an ongoing and daily basis targeting overseas car buyers from GlobalAutoUSA.com and other websites registered by Global Defendants with the intent to defraud foreign buyers.  Plaintiffs were directly and proximately harmed by Global Defendants' predicate acts of racketeering, including wire fraud, mail fraud, and Travel Act violations, which resulted in ascertainable financial losses to the Plaintiffs.

**Background of DK International's involvement in this case**

On November 10, 2014, intervenor DK International[3] was granted judgment in its favor by the Superior Court of New Jersey on its claims against Kapustin and its entities,

---

[3] DK International's motion to intervene was granted on December 9, 2015.  (Docket No. 304.)

finding that defendants were engaged in fraudulent business practices.  DK International had an agreement with the Global Defendants where DK International would fund vehicles purchased by the Global defendants, and it would be reimbursed for those costs, along with half of the profits of the sale of those vehicles.  Kapustin and the Global defendants failed to reimburse DK International for $207,932.50.  After a bench trial, the state court judge entered judgment in DK International's favor in that amount, along with $50,000.00 in punitive damages because of the defendants' "egregious" fraud.  (Docket No. 351-2 at 5.)  DK International seeks to be relieved of the Court's July 1, 2015 order[4] freezing defendants' assets so that it may enforce its November 10, 2014 judgment, which was domesticated on May 7, 2015.  (Docket No. 351.)

**Issues currently pending before the Court**

DK International seeks relief from the freeze order on several bases.  An additional basis arose during the pendency of DK International's motion when the United States Supreme Court issued a decision on the extraterritorial reach of the RICO statute: RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2096 (2016).  DK International has supplemented its motion to be relieved from the freeze order by arguing that the default judgment entered against Kapustin and the Global

---

[4] The Freeze Order was dated July 1, 2015, but it was docketed on July 2, 2015.

defendants has been invalidated by the RJR Nabisco case, which determined that relief under RICO is unavailable to foreign private party plaintiffs if their damages were not incurred in the United States.

DK International argues that without any valid default judgment, there cannot be any valid freeze orders related to those RICO violations, and the Court should therefore dissolve the Order freezing defendants' assets.  (Docket No. 363.) Kapustin has filed a motion to vacate the default judgment entered against him on the same basis.  (Docket No. 368.) Plaintiffs have opposed both motions on all the bases presented.

## DISCUSSION

### A.   Subject Matter Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

### B.   Analysis

The resolution of the pending motions involves two separate analyses.  First, the Court must consider the impact of RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2096 (2016) on this case.  Second, the Court must determine whether DK International may be permitted to enforce its November 10, 2014 judgment due to the existence of the July 1, 2015 freeze order.

**1.  Whether the Court must vacate the default judgment entered against Kapustin and the Global defendants pursuant to _RJR Nabisco, Inc. v. European Community_, 136 S. Ct. 2090 (2016).**

DK International and Kapustin have seized upon a succinct sentence in the Supreme Court's decision in _RJR Nabisco, Inc. v. European Community_, 136 S. Ct. 2090 (2016), to invalidate the default judgment entered against Kapustin and the Global defendants for their violations of RICO.  The Supreme Court held, "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." _RJR Nabisco_, 136 S. Ct. at 2111.  These parties argue that because the foreign plaintiffs suffered their injuries in Russia – i.e., they lost their money in Russia for cars that were purchased in Russia but never delivered to Russia – they have not incurred a domestic injury to support a private cause of action under RICO.[5]  Putting aside the issue of whether the _RJR Nabisco_ case applies retroactively,[6] the Court disagrees

_____

[5] Although DK International has written two letters to the Court regarding the applicability of the _RJR Nabisco_ case (Docket No. 363 and 370), DK International has not been granted its request to file a supplemental brief to more formally express its view on _RJR Nabisco_.  As DK International notes in its second letter (Docket No. 370), the Court has an independent obligation to assess subject matter jurisdiction, _Zambelli Fireworks Mfg. Co. v. Wood_, 592 F.3d 412, 420 (3d Cir. 2010), and, under Fed. R. Civ. P. 60(d), the Court may independently relieve a party from an order.  Thus, additional briefing by DK International on the current issues before the Court is not necessary.

[6] It appears that the decision in _RJR Nabisco_ does apply retroactively.  _See Harper v. Virginia Dept. of Taxation_, 509

12

with DK International's and Kapustin's view that the
plaintiffs have not suffered a domestic injury within the
meaning of the RICO statute.

In RJR Nabisco, the European Community and 26 of its
member states (hereinafter "EC") sued RJR and numerous related
entities for their alleged participation in a global money-
laundering scheme in association with various organized crime
groups.  EC first sued RJR in the Eastern District of New York
in 2000, alleging that RJR had violated RICO, and the case
spread into several actions over 16 years.  RJR Nabisco, 136
S. Ct. at 2097.

> Greatly simplified, the complaint alleges a scheme in
> which Colombian and Russian drug traffickers smuggled
> narcotics into Europe and sold the drugs for euros that—
> through a series of transactions involving black-market
> money brokers, cigarette importers, and wholesalers—were
> used to pay for large shipments of RJR cigarettes into
> Europe.  In other variations of this scheme, RJR
> allegedly dealt directly with drug traffickers and money
> launderers in South America and sold cigarettes to Iraq
> in violation of international sanctions.  RJR is also
> said to have acquired Brown & Williamson Tobacco
> Corporation for the purpose of expanding these illegal
> activities.  The complaint alleges that RJR engaged in a
> pattern of racketeering activity consisting of numerous
> acts of money laundering, material support to foreign
> terrorist organizations, mail fraud, wire fraud, and
> violations of the Travel Act.  RJR, in concert with the
> other participants in the scheme, allegedly formed an
> association in fact that was engaged in interstate and
> foreign commerce, and therefore constituted a RICO
> enterprise that the complaint dubs the "RJR Money-
> Laundering Enterprise."  . . .

---

U.S. 86, 97 (1993) ("When this Court applies a rule of federal
law to the parties before it, that rule is the controlling
interpretation of federal law and must be given full
retroactive effect in all cases still open on direct review
and as to all events, regardless of whether such events
predate or postdate our announcement of the rule.").

> These violations allegedly harmed [EC] in various ways,
> including through competitive harm to their state-owned
> cigarette businesses, lost tax revenue from black-market
> cigarette sales, harm to European financial institutions,
> currency instability, and increased law enforcement
> costs.

Id. at 2098.

The Supreme Court was tasked with answering two questions: (1) Do RICO's substantive prohibitions contained in § 1962, violations of which are subject to criminal penalties, apply to conduct that occurs in foreign countries? and (2) Does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries? Id. at 2099-2100.

The Supreme Court began its analysis by reviewing the law of extraterritoriality. With regard to the first question, the Supreme Court found that each of RICO's substantive prohibitions contained in § 1962 requires proof that a RICO enterprise "engage[d] in, or affect[ed] in some significant way, commerce directly involving the United States--e.g., commerce between the United States and a foreign country." Id. at 2015. In other words, an alleged pattern of racketeering activity must consist "of predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially."[7]  Id.

---

[7] The Supreme Court found that EC's allegations that RJR violated §§ 1962(b) and (c) did not involve an impermissible

14

The Supreme Court set a different standard for RICO's private right of action provided in § 1964(c).  The Supreme Court's focus was not on the conduct of the enterprise, but rather where the private RICO plaintiff suffered his injury. Even though § 1964(c) allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue for treble damages, costs, and attorney's fees, the Supreme Court found that § 1964(c) did not overcome the presumption against extraterritoriality.  Id. at 2016.

The Supreme Court emphasized that the question presented was whether a court has authority to recognize a private cause of action under U.S. law for injury suffered overseas, and noted that "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." Id. at 2108, 09.  The Supreme Court observed that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." Id. at 2106.

For example, to apply U.S. remedies could unjustifiably permit foreign citizens "to bypass their own less generous

---

extraterritorial application of RICO, but it did not decide whether the complaint satisfied any other requirements of RICO, or whether the complaint in fact made out violations of the relevant predicate statutes.  RJR Nabisco, 136 S. Ct. at 2106 and 2106 n.8.

remedial schemes, thereby upsetting a balance of competing considerations that their own domestic [] laws embody."  Id. 2106-07 (citation omitted).  The Supreme Court further observed that even though "a risk of conflict between the American statute and a foreign law is not a prerequisite for applying the presumption against extraterritoriality, where such a risk is evident, the need to enforce the presumption is at its apex."  Id. at 2107 (quotations and citation omitted).

Accordingly, the Supreme Court concluded, "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries."[8]  Id. at 2111.

DK International and Kapustin argue that plaintiffs' RICO claims brought pursuant to § 1964(c) are exactly those that the Supreme Court deemed to be barred by the presumption against extraterritoriality.  The Court does not agree. Simply because plaintiffs reside in Russia and never physically traveled to the United States does not automatically classify their injuries to be "foreign."

As the Supreme Court cautioned at the conclusion of RJR Nabisco, "[t]he application of [the domestic injury] rule in any given case will not always be self-evident, as disputes

---

[8] The Supreme Court ultimately concluded that the remaining RICO damages claims rested entirely on injuries suffered abroad and must be dismissed.  RJR Nabisco, 136 S. Ct. at 2111.

may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" Id. at 2111. The Supreme Court did not delve into how injuries are to be classified as foreign or domestic, but the classification of an injury cannot simply be based on a plaintiff's residence.[9] A deeper analysis must be performed on the facts of each case.

It is true that plaintiffs live in Russia, and several former USSR Republics, and they never set foot in the United States. They shopped from Eastern Europe for cars on the internet, and wired money from their home countries from foreign accounts to purchase their cars. Defendants failed to ship their cars to Eastern Europe, and defendants failed to return their money to Eastern Europe. The key to this case is that plaintiffs suffered their injuries the moment they clicked the computer mouse - on a United States-based website representing United States-based car dealerships - and ordered and paid for a car whose condition was materially misrepresented or did not even exist at all.

If plaintiffs traveled to the United States, went to the physical location of Kapustin's purported car dealerships in New Jersey and Pennsylvania, chose a car, paid for it on the

---

[9] The Supreme Court observed that § 1964(c) of RICO does not contain specific language like the Clayton Act, which specifically allows recovery for foreign injuries. RJR Nabisco, 136 at 2110. But the Supreme Court further noted, "This does not mean that foreign plaintiffs may not sue under RICO." Id. at 2110 n.12.

spot, and arranged for the car to be shipped to Eastern
Europe, plaintiffs would have suffered from a clear domestic
injury when Kapustin failed to deliver the car and failed to
return plaintiffs their money.

Plaintiffs' traveling by way of the internet to
Kapustin's virtual United States-based car dealerships, where
plaintiffs selected their car, paid for it through a wire
transfer to Kapustin's U.S. bank, and arranged for shipping
from the United States, should not change their injuries from
domestic to foreign when Kapustin failed to deliver their cars
from the United States or refund their money from the United
States.

This is not a situation where an American car dealership
operated a branch in Russia, either physically or virtually
through a Russian-based website, and defrauded Russian
customers in the same way as Kapustin has defrauded plaintiffs
in this case.  In that scenario, plaintiffs could not lodge a
private RICO action in the United States against the American
car dealership, even if the enterprise met the elements of §
1962, because the customers' injuries were suffered in Russia.
This scenario is akin to RJR Nabisco, where the European
Community suffered injuries at the hands of United States-
based RJR Nabisco's alleged money laundering enterprise.  The
EC suffered injuries in their communities, and not in the
United States, such as competitive harm to their state-owned
cigarette businesses, lost tax revenue from black-market

18

cigarette sales, harm to European financial institutions, currency instability, and increased law enforcement costs. RJR Nabisco, 136 S. Ct. at 2098.

To rule this case outside § 1964(c) would allow the United States to become a haven for internet fraud despite Congress' dual intent both to create a private cause of action under RICO and incorporate predicate acts of mail and wire fraud which extend expressly to transactions affecting foreign commerce. A person responsible for a United States-based fraudulent scheme to defraud people overseas should not escape liability under a federal law that permits private causes of action to redress that fraud simply because the scheme targets foreign citizens over the internet.

The RJR Nabisco domestic injury requirement derived from the Supreme Court's concern that foreign citizens would bypass their own less generous remedial scheme, and upset the balance of competing considerations of their own domestic laws. See id. 2106-07. That concern is not present in this case, where plaintiffs "traveled" to the United States to purchase cars represented to be located in the United States and were defrauded in that process. Plaintiffs should be afforded the same remedies available to a United States citizen who purchased a car from defendants in the exact same manner and were defrauded in the exact same scheme.

Importantly, the Plaintiffs here are not forum shopping. They have come to the place where they were induced by fraud

19

to send their money and where those ill-gotten proceeds were realized and retained by Kapustin and the Global Defendants. While Plaintiffs could have presumably sought relief in their domestic courts it would have likely been an exercise in futility and any judgment obtained worthless.  The defendants have no assets in those countries, operate no businesses there, and have not traveled there.  Indeed it was the very remoteness of the victims from the organizers of the scheme that contributed to the success of the scheme.

In a fraudulent and criminal scheme that crosses borders, the extraterritoriality analysis should be a two-way street. The Plaintiffs here could have been anywhere in the world and actually came from several countries.  Defendants, however, choose to operate their fraudulent scheme from New Jersey and Pennsylvania.  The locus delecti of the crimes committed is the United States.  Nothing in 18 U.S.C. § 1964(c) suggests Congress intended to exclude a scenario like this one from the reach of a private victim, even a foreign one.

Consequently, the Court finds that RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016) does not require this Court to vacate the default judgment entered against Kapustin and the Global defendants based on their violations of RICO.

**2.   Whether DK International is precluded from pursuing its judgment against Kapustin and the Global defendants because of the Court's July 1, 2015 freeze order**

As noted above, DK International seeks to be relieved of the Court's July 1, 2015 order freezing defendants' assets so that it may enforce its November 10, 2014 judgment, which was domesticated on May 7, 2015.  The freeze order provided:

> 1. Defendants and their agents, employees, attorneys, independent contractors, officers, directors, successors, assigns and affiliates, including Preor Oy, which is controlled by the Defendants, and all persons who receive actual notice of this Order by personal service, mail, email, facsimile transmission or otherwise, are immediately **ENJOINED** from removing, withdrawing, drawing upon, pledging from, transferring, setting off, receiving, changing, selling, assigning, liquidating, or otherwise disposing of Defendants' interest in, directly or indirectly, in any assets located in the United States and in foreign countries, including but not limited any motor vehicles, real estate, cash funds, funds held in any bank accounts in the United States and foreign countries in the amount of up to $1,500,000.00 (one million five hundred dollars).
>
> 2. Any assets, located in the United States and in foreign countries, including but not limited any motor vehicles, real estate, cash funds, funds, incoming wires, transfer funds and deposits in the names of, or subject to control by Defendants, directly or indirectly, or through their agents, employees, attorneys, independent contractors, officers, directors, successors, assigns and affiliates, including Preor Oy, located in the United States and foreign countries in the amount of up to $1,500,000.00 (one million five hundred dollars) shall be **FROZEN AND RESTRAINED** until further Order of this Court. This Order shall also apply to all persons aiding, abetting, or acting in active concert, participation or under the control of Global Defendants.

(Docket No. 229 at 4-5.)

DK International argues that the freeze order is improper for several reasons,[10] but primarily it argues that it should not be interpreted to prevent it from executing its judgment against the assets of Kapustin and the Global defendants, which are being held by Michael Hitrinov a/k/a Michael Khitrinov and Empire United Lines Co., Inc. ("EUL defendants").  The EUL defendants are in possession of 15 vehicles purportedly belonging to Kapustin and the Global defendants, and DK International's writ of execution was served by the New York County Office of the Sheriff on August 13, 2015 upon the EUL defendants.[11]  DK International argues that it should be permitted to retrieve those vehicles to

---

[10] One of DK International's arguments is that the freeze order is improper under the Supreme Court's decision in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 332–33 (1999), where the Supreme Court held that a plaintiff who is sued for breach of contract seeking damages, a remedy at law, could not obtain a preliminary injunction against the assets of a debtor, against whom it had no judgment, that would be in effect until the resolution of the plaintiff's claims.  The Grupo Mexicano case is distinguishable from the situation here, where the freeze order was issued after two years of litigation which evidenced a circus of fraudulent acts performed by Kapustin, including lying to the Court, violating court orders, and fraudulently filing bankruptcies.  The Grupo Mexicano decision does not preclude the Court from imposing sanctions on a defendant or imposing equitable relief to prevent the defendant from committing further fraud.

[11] Plaintiffs argue that the writ of execution is invalid because it was served on the EUL defendants, which have physical possession of the vehicles but do not have ownership of the vehicles.  The Court does not need to opine on the validity of the writ of execution at this time.

satisfy its judgment against Kapustin and the Global defendants.

By way of background as to how the EUL defendants came to possess the 15 vehicles in dispute, the Global entities had filed an action in the U.S. District Court for the Eastern District of New York (the "EDNY action") for breach of contract, conversion, and replevin against the EUL defendants for their continued possession of the vehicles.  The Global entities then filed cross-claims against the EUL defendants in this case.  The cross-claims asserted in this case were identical to the claims in the EDNY action, but were limited to the vehicles purchased by five plaintiffs.

The Global entities also alleged that the EUL defendants seized the vehicles located at the time in Elizabeth, New Jersey without any legal or equitable right.  The EDNY action was dismissed, and the Global entities then amended their cross-claims here to include all claims in the EDNY action, including replevin of the Elizabeth Vehicles, and to include Sergey Kapustin as a plaintiff individually.  Thus, through the assignment of the Global entities' claims against the EUL defendants, the 21 plaintiffs who were victims of Kapustin's and the Global entities' fraud are now prosecuting the claims of the Global entities against the EUL defendants.

The pending claims against the EUL defendants are in their infancy. (See Docket No. 377.)  Plaintiffs have alleged in their most recent complaint that "the Empire Defendants are

23

unlawfully holding 15 vehicles either belonging to Crossclaim Plaintiffs or contracted to customers.  The Empire Defendants have previously represented to the Court that the vehicles were located in their warehouse in Elizabeth, New Jersey (the 'Elizabeth Vehicles').  The titles to the Elizabeth Vehicles are currently in registry of this Court pursuant to the Order, dated July 14, 2015 (ECF 237).  Crossclaim Plaintiffs seek injunctive relief from this Court in the form of an order compelling Defendants to immediately release the Elizabeth Vehicles, which are unlawfully held by the Empire Defendants, into the registry of this Court.  Crossclaim Plaintiffs have further been forced to bring the instant lawsuit in order to recoup for lost profits and lost business suffered by Crossclaim Plaintiffs as a result of the Defendants' breach of contract and other fraudulent and illegal activities, which have resulted in direct and consequential damages in excess of $1,000,000."  (FACCC, Docket No. 274 at 2.)

In the EDNY action, and presumably in this action if they are eventually compelled to file an answer to the FACCC, the EUL defendants have denied Kapustin's and the Global defendants' right to those vehicles.  Those assets were encumbered by the EDNY litigation, and they are currently encumbered by this litigation.[12]  Because the ownership of the

---

[12] The EDNY litigation was dismissed without prejudice on October 1, 2015.  On October 9, 2015, plaintiffs filed their cross-claim complaint.  For eight days, the vehicles were not subject to litigation.  The titles were, however, in this

subject vehicles is in dispute, any right of DK International
to those vehicles is currently inchoate.

Relatedly, and most importantly for the resolution of DK
International's current motion, is that the freeze order
cannot be read to freeze assets (1) that do not belong to any
of the defendants, or (2) where the possessory interest in
those assets is in dispute.[13]  The vehicles DK International
seeks to recover to satisfy its judgment currently fall in the
second category, and if the EUL defendants prevail in the
dispute between them and the cross-claim plaintiffs, the
vehicles will fall into the first category.  Only if the
cross-claim plaintiffs prevail on their claims against the EUL
defendants will the vehicles be subject to the freeze order.[14]

---

Court's registry, where they had been since July 14, 2015,
which predates DK International's writ of execution.

[13] The freeze order also does not prevent a judgment lien
holder from having a writ of execution served onto defendants'
assets.  The freeze order merely prevents the disposition of
any asset while the order is in effect.  The priority of an
asset's liens is a separate issue.  Indeed, had the Court not
entered the freeze order, more of defendants' assets would
have dissipated through Kapustin's fraudulent actions, leaving
no assets for a judgment lien holder to attach.  The Court
notes, however, that even with the freeze order, it appears
that Kapustin's fraudulent conduct has persisted, and known
and hidden assets have been further dissipated.  The Court's
retention of several vehicle titles at the early stage in this
case has caused those vehicles to apparently be one of the
only assets available to DK International and other parties
harmed by Kapustin.  But DK International is not precluded
from seeking to enforce its judgment on defendants' other
assets that may exist.

[14] DK International argues that the Kapustin and the Global
defendants' assignment of their claims to the plaintiffs
violated the freeze order.  To the extent that the freeze

Accordingly, because the Court has determined that the vehicles held by the EUL defendants are not subject to the freeze order, DK International's motion to be relieved of the freeze order to pursue those vehicles must be denied.  DK International is entitled to pursue the execution of its judgment as appropriate under the laws governing a judgment creditor's lien on a debtor's property, including property that is subject to a pending legal dispute.[15]

**CONCLUSION**

The domestic injury requirement for a private cause of action under RICO announced in RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016) does not affect the validity of the default judgment entered against Kapustin and the Global defendants because plaintiffs have suffered domestic injuries.  With the default judgment intact, the July 1, 2015 freeze order based on defendants' RICO violations remains intact.  The freeze order was not improperly entered, and it does not preclude DK International from its rights to enforce

_____

order does not apply to inchoate claims, the assignment was not in violation of the freeze order because the defendants' claims are pending.  The continuing viability of the freeze order will need to be addressed, however, if and when the currently inchoate claims become choate.

[15] The Court placed into the registry the titles of the "Elizabeth vehicles" as a measure to protect those assets from Kapustin's extensive and continuing fraudulent actions. Unless DK International informs the Court otherwise, the Court's retention of these titles does not prohibit a judgment lien holder's rights to that property as set forth by the applicable state law governing those rights.

its judgment under the appropriate law governing attachment of a debtor's assets.  Based on these findings, the Court must deny both DK International's motion for relief from the freeze order and Kapustin's motion to vacate the default judgment.

An appropriate Order will be entered.

Date:  December 8, 2016          s/ Noel L. Hillman  _
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.